## GOUGAR v. TIMBERLAKE ET AL.

[No. 17,760. Filed Feb. 24, 1897. Rehearing denied May 21, 1897.]

ELECTIONS.— *Woman Suffrage.— Constitutional Law.*— The provision of article 2, section 2, of the state constitution that "in all elections not otherwise provided for by this constitution, every male citizen of the United States of the age of twenty-one years and upward * * * shall be entitled to vote," is not a grant which merely limits or restricts the right to vote, but is a political privilege expressly granted to the class of persons therein specified, and which does not exist except as it is given by the constitution and written laws of the State. *pp. 39, 40.*

SAME.—*Suffrage.—Constitutional Law.*—The right of suffrage is not given by the federal constitution but by the State. *p. 47.*

SAME.—*Woman Suffrage.—Constitutional Law.*—The general rule of construction, that which is expressed makes that which is silent cease, applies to article 2, section 2, of the state constitution, which gives to male citizens in express terms the right to vote. *p. 48.*

From the Tippecanoe Superior Court. *Affirmed.*

*H. B. Sayler, S. M. Sayler, J. M. Sayler, Helen M. Gougar* and *John D. Gougar,* for appellant.

A. A. Rice and W. S. Potter, for appellees.

HACKNEY, J.—The question in this case is, have women, under existing laws in this State, the privilege of suffrage, or is sex a qualification upon the right to vote for public officers?

The constitution of this State, article 2, section 2, provides that, "In all elections not otherwise provided for by this Constitution, every male citizen of the United States, of the age of twenty-one years and upward," etc., "shall be entitled to vote," etc. The statute as to the qualification of electors, section 6192, Burns' R. S. 1894, is substantially in the language of the constitution cited. It will be observed that the language employed grants to males the right to vote, and that it does not expressly negative the privilege to female citizens.

In this respect our constitution is like that of every state in the Union, and proceeds upon the assumption that the privilege of voting is not an inherent or natural right, existing in the absence of constitutional and legislative grant and to be limited or restricted only by constitutional or legislative provision. If this assumption is correct, and there is no right of suffrage except as it is given by the constitution and written laws, we have reached the solution of the question at issue. Back of the constitution, and resting with those having the power to make and unmake constitutions, is the fountain and source of all power. From that source we receive such political rights as we possess, and our concurrence in the constitution is our consent to such an abridgment of our natural rights as that sacred instrument may contain. If suffrage is a natural right, it is not abridged as to any citizen on account of sex, but if it is a political privilege it is held only by those to whom it is granted.

That it is a political privilege and not a natural right has been affirmed, not only in this assumption of the framers of every constitution in the land, but it has been declared by all authority and precedent without exception.

Judge Cooley, in his Principles of Constitutional Law, p. 248, declares that "participation in the suffrage is not of right, but it is granted by the state on a consideration of what is most for the interest of the state. Nevertheless, the grant makes it a legal right until it is recalled, and it is protected by the law as property is." Again he says, p. 259, "During the last quarter of a century, while the agitation for an enlargement of civil rights has been violent, sentiment has had a great and extraordinary influence on public affairs in America. It has much affected the discussion of political privileges, and considerable numbers have insisted that suffrage was a natural right, corresponding to the right to life and liberty, and equally unlimited. Unless such a doctrine is susceptible of being given practical effect, it must be utterly without substance; and so the courts have pronounced it." One of the reasons for this conclusion, said by the distinguished jurist to be insurmountable, is, that "suffrage cannot be the natural right of the individual, because it does not exist for the benefit of the individual, but for the benefit of the state itself. Suffrage is participation in the government: in a representative country it is taking part in the choice of officers, or in the decision of public questions. * * * The purpose is therefore public and general, not private and individual. * * * Suffrage must come to the individual, not as a right, but as a regulation which the state establishes as a means of perpetuating its own existence, and of insuring the people the blessings it was intended to secure." Id. p. 260. See to the

same effect, Cooley's Const. Lim. (6th ed.), p. 752; Story on the Constitution (5th ed.), ch. 9, sections 577-584; Black's Constitutional Law, p. 466; 2 Burgess Political Science, p. 110; *Minor* v. *Happersett*, 21 Wall. (U. S.) 162; *Anderson* v. *Baker*, 23 Md. 531; 2 Lieber's Miscellaneous Writings, pp. 204, 205; *Bloomer* v. *Todd*, 3 Wash. T. 599, 19 Pac. 135; *Morris* v. *Powell*, 125 Ind. 281; 2 Bryce's Am. Com., p. 437.

Black, *supra*, says: "It has sometimes been contended that the right to take part in the administration of government or in the choice of those who are to make and execute the laws, by means of the ballot, is a natural right, standing in the same category with the rights of life, liberty, and property. * * * But it remains not less true that the right of suffrage is not a natural right, but a political right; not a personal right, but a civil right. It does not owe its existence to the mere fact of the personality of the individual, but to the constitution of civil government. Nor is it even a necessary attribute of citizenship. These principles are established by the following considerations. First, the exercise of an absolutely universal suffrage would imperil the very continuance of the government. Second, the right of suffrage does not exist for the benefit of the individual, but for the benefit of the state itself. Third, there have been restrictions upon the suffrage in all democratic or republican governments known to history, even the most free."

After presenting some of the reasons for and against a more universal suffrage, Mr. Justice Story, section 581, *supra*, says: "Without laying any stress upon this theoretical reasoning, which is brought before the reader, not so much because it solves all doubts and objections, as because it presents a view of the serious difficulties attendant upon the assumption of an original and unalienable right of suffrage, as originating

in natural law, and ·independent of civil law, it may be proper to state that every civilized society has uniformly fixed, modified, and regulated the right of suffrage· for itself, according to its own free will and pleasure." Again he says, in concluding section 582, "So that we have· the most abundant proofs that among a free and enlightened people, convened for the purpose of establishing their own forms of government and the rights. of their own voters, the question as to the due regulation of the qualifications has been deemed a matter of mere state policy, and varied to meet the wants, to suit the prejudices, and to foster the interest of the majority. An absolute, indefeasible right to elect or be elected seems never to have been asserted on one side or denied on the other; but the subject has been freely canvassed as one of mere civil polity, to be arranged upon such a basis as ·the majority may deem expedient with reference to the moral, physical, and intellectual condition of the particular state."

Dr. Lieber says, *supra*, "The adoption of universal suffrage has led many persons to the belief and broad assertion that the right of voting is a natural right, and if it is a natural right, it ought, as a matter of course, to be extended to women; while, on the other hand, many persons seem to profess that no qualification whatever * * * should be demanded as a requisite for the right of voting. All these are erro-· neous conceptions. * * * But how can so special a right as that of voting for a representative be a natural right, when the representative government itself is something that does not spring directly from the nature of man, however natural it may be in another sense of the word—that is to say, consistent with the progress of civilization? It is the latest and highest of all civilized governments; but where was

the natural right of suffrage under the patriarchal government—in the Mosaic commonwealth, founded on a hereditary and priestly nobility; where in the Asiatic despotism—types of government necessary in their season—when nothing and nobody was voted for? * * * The representative system is the only means of protecting individual liberty, and preventing democratic despotism. The right of suffrage, therefore, is a noble right, or ought to be so; but it is not a natural right. It is a political right, to which Providence has led man in the progressive course of history."

In *Morris* v. *Powell*, 125 Ind. 281, 315, this court said: "It is because this right of suffrage is a political right, abiding in the fountain of power, that the legislature cannot lay so much as a finger upon it, except when expressly authorized by the organic law, and for this reason it is that the legislature cannot make a classification of its own, no matter whether there is or is not equality. It is because the right of suffrage is a political right, as has been decided by the Supreme Court of the United States, and by other courts, that the provisions of the Constitution respecting the bestowal of special privileges and immunities have no application to legislation upon the subject."

Our constitution sought to establish a representative government, a government wherein only limited numbers express the will of all the people; and it was declared that those to represent the whole number should be males, possessing the qualifications enumerated. The government thus established is but the agent or trustee of the State, the people; and it has derived its authority through the constitution. In forming this government the people declared that their authority should be exercised by and at the command of males of a designated class. That the exercise of

such authority may be entrusted to enlarged classes with fewer restrictions, there is and can be no doubt; but to do so is with those who gave the authority, the people; and it is no more within the power of the judicial or the legislative branch of the government to modify the will of the people as expressed in the constitution, than it is for the agent, in any case, to stand above the principal in authority.

As said in *Morris* v. *Powell, supra,* "The right of suffrage is one for the consideration of the people in their capacity as creators of constitutions, and is never one for the consideration of the legislature," and we may add, of the courts, "except in so far as the constitution authorizes a regulation of its mode of exercise. The people create, define, and limit their own right to vote."

Those of us who have come into the State since the adoption of the constitution, and those who did not vote for its adoption, as well as those who may have voted against its adoption, are alike bound by its provisions, and we can exercise no political or governmental right or privilege which is not given by it. Such privilege as that of suffrage was not given to women; and if it only exists by grant, as we have shown, it must be admitted that those to whom it was given may exercise it as the agents of the State, the whole people, males and females, not possessing it. If an agency exists which is contrary to our ideas of advancing civilization and the highest sense of liberty, our privilege is to change it, but only through the authority of the principal, the State.

That the privilege of voting does not exist in the absence of grants from the people or their authorized representatives, is consistent with the decisions which declare that legislatures may not abridge the privilege as declared in the constitutions by adding restric-

tions or limitations not therein defined. *Green* v. *Shumway,* 39 N. Y. 418; *McCafferty* v. *Guyer,* 59 Pa. St. 109; *People* v. *Canaday,* 73 N. C. 198; *Monroe* v. *Collins,* 17 Ohio St. 665; *Rison* v. *Farr,* 24 Ark. 161; *Randolph* v. *Good,* 3 W. Va. 551; *Brown* v. *Grover,* 6 Bush 1; *State* v. *Williams,* 5 Wis. 308; *State* v. *Baker,* 38 Wis. 71; *Davies* v. *McKeeby,* 5 Nev. 369; *Clayton* v. *Harris,* 7 Nev. 64; Cooley's Con. Lim. (6th ed.), p. 753; Black on Const. Law, p. 471; *Morris* v. *Powell,* 125 Ind. 281; *Quinn* v. *State,* 35 Ind. 485. See, also, *Feibleman* v. *State,* 98 Ind. 516, where the same principle is adhered to.

Giving full force to the decisions of this court just cited, there is no escape from the conclusion that sex is one of the qualifications, under our constitution, upon the privilege of suffrage. It was held in *Morris* v. *Powell,* and *Quinn* v. *State* that the qualifications specified in the constitution could not be enlarged or diminished, and in the former it was particularly pointed out that sex was a qualification. Not only do authority and the assumption by all of the states, in the form of their grants of suffrage, establish the theory that the privilege exists only with those to whom it is expressly given, but it is supported by the fact that if it should be held that females were not denied the privilege, there would be an entire absence of restriction upon the privilege as to them. Age, residence, and naturalization, would be required of males; but as to females, the youngest and the oldest, nonresidents, aliens and all, there would be no restriction. If intention should be considered as a rule of construction, and it is always of first importance, there could be little doubt that the framers of the constitution did not intend any such consequences.

The direct question before us has frequently been

decided by courts of the highest authority. *Spencer* v. *Board, etc.*, 1 MacArthur 169; *Van Valkenburg* v. *Brown*, 43 Cal. 43; *Minor* v. *Happersett, supra; Bloomer* v. *Todd, supra; United States* v. *Anthony*, 11 Blatchf. 200.

It is insisted further that the fourteenth amendment to the constitution of the United States secures to the appellant the elective franchise. The provision referred to is that "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty or property without due process of law, nor to deny any person within its jurisdiction the equal protection of the laws."

If this amendment had created universal suffrage, there would have been no need for the fifteenth amendment, which provides that "the right of the citizens of the United States to vote shall not be denied or abridged by the United States, or by any State, on account of race, color, or previous condition of servitude." Judge Cooley says, "The constitution of the United States confers the right to vote upon no one. That right comes to the citizens of the United States, when they possess it at all, under state laws, and as a grant of state sovereignty. But the fifteenth amendment confers upon citizens of the United States a new exemption, namely, an exemption from discrimination in elections on account of race, color, or previous condition of servitude." Principles of Constitutional Law, *supra*, p. 277. In the same work, p, 274, he says: "The second clause of the fourteenth article was intended to influence the states to bring about by their voluntary action the same result that is now accom-

plished by this amendment. It provided that when the right to vote was denied to any of the male inhabitants of a state, being twenty-one years of age and citizens of the United States, or in any way abridged except for participation in crime, the basis of representation in Congress should be reduced in the proportion which the number of such male citizens should bear to the whole number of male citizens twenty-one years of age in such state. By this, the purpose was to induce the states to admit colored freemen to the privilege of suffrage by reducing the representation and influence of the States in the federal government, in case they refused." That suffrage is not given by the federal constitution, but is the right of the states. See, also, Story, *supra*, section 1932; Black, *supra*, 467; *Minor* v. *Happersett, supra; Bloomer* v. *Todd* (Wash.) 1 L. R. A. 111; *United States* v. *Reese*, 92 U. S. 214; *United States* v. *Cruikshank*, 92 U. S. 542; *United States* v. *Crosby*, 1 Hughes 448; *Kinneen* v. *Wells*, 144 Mass. 497, Desty. Fed. Const. 287; *Huber* v. *Reiley*, 53 Pa. St. 112; *United States* v. *Anthony, supra*; *Spencer* v. *Board, supra; Spragins* v. *Houghton*, 3 Ill. 377; *Anthony* v. *Halderman*, 7 Kan. 50; *Van Valkenburgh* v. *Brown*, 43 Cal. 43, 13 Am. Rep. 136.

It is upon this theory alone that the great variety of provisions with reference to suffrage and the qualifications upon the privilege is found in the several constitutions of the states, and, although not always in accord, they are not in conflict with the constitution of the United States. Appellant is in error in assuming that citizenship and suffrage are by the federal constitution made inseparable. Many are citizens, and not voters, unless we may hold that the state constitution does not discriminate against persons on account of age, residence, etc., and that disfranchisement for

crime, etc., may not be made by law. Nor do negroes get their right of suffrage, under the fourteenth and fifteenth amendments to the constitution, simply by reason of citizenship, as appellant earnestly insists. The fifteenth amendment, as we have shown, takes from the state the right, in extending the privilege of suffrage, to discriminate against citizens "on account of race, color or previous condition of servitude." It cannot be said, therefore, that the constitution of Indiana is in conflict with the fifteenth amendment in discriminating against the appellant on account of sex.

By the language of all of the constitutions, which but affirms the right of voting to those intended to possess it; by the holdings of the courts passing upon the question of the origin, existence, and grant of political privileges, including the decisions cited from this court, and upon the reasoning of those eminent authors who have written upon constitutional law, it must be held that the general rule of construction, that that which is expressed makes that which is silent cease, applies in the case before us.

It is insisted, however, against this conclusion, that the decision of this court, *In re Leach,* 134 Ind. 665, denies the application of the rule or maxim *Expressio unius, exclusio alterius.*

That case involved the right of women, possessing the qualifications required by the rules of the court in which they sought to practice law, to be admitted to practice in the profession of the law in such court. The constitution, as to the practice of law, extended the right to voters, and as to others was silent. The maxim quoted was there denied application, because, as it was believed, the right to practice law was not a political question, was governmental in no respect, but that it belonged to that class of rights·inherent in

every citizen, and pertained to the fundamental duty of every inhabitant to gain a livelihood; that this duty involved the privilege of choosing any honorable vocation or profession not forbidden by law, and recognizing the existing right of the people, in the constitution or by legislation, to regulate the manner of pursuing that vocation or profession. Constitutions had not recognized the practice of an honorable profession as a governmental question. Throughout the ages it had been deemed proper, in the interest of the public, that legislative regulation of the legal profession might be enacted and enforced. It was, therefore, believed that the constitutional grant of the privilege of practicing law to a class was not intended as a denial of the right to others. It was not thought that the grant was more than a measure of regulation as to the class especially mentioned, nor that it was in effect an inhibition as to others. Judge Cooley says (Const. Lim., 484): "To forbid to an individual or a class the right to the acquisition or enjoyment of property in such manner as should be permitted to the community at large, would be to deprive them of *liberty* in particulars of primary importance to their 'pursuit of happiness;' and those who should claim a right to do so ought to be able to show a specific authority therefor, instead of calling upon others to show how and where the authority is negatived."

In Story on the Constitution, section 1934, it is said that the right "to acquire, possess, and enjoy property," and "to choose from those which are lawful the profession or occupation of life," are among the privileges which the states are forbidden, by the constitution of the United States, to abridge. *In re Leach, supra,* we do not regard as an authority upon the question before us.

We are not prepared to say, under the existing so-cial conditions, considering the marked intellectual advancement of women since the adoption of the pres-ent constitution, that the elective franchise should not be given them. There are many questions to be settled by the ballot which would enlarge the sphere of freedom, would advance the morals and lighten the burdens of humanity, would redeem homes from the wreckful influences of intemperance, and would stay the mad pace of partisan bias and corruption. But to what extent the ballot in the hands of women would tend to increase or to destroy their present great influence in the affairs of man, the home, and the state cannot be known in advance of the experiment.

Whatever the personal views of the judges upon the advisability of extending the franchise to women, all are agreed that under the present constitution it cannot be extended to them.

The judgment of the lower court, in sustaining the demurrer of the appellees to the appellant's com-plaint for damages in denying her the right to vote, is affirmed.