RAFAEL MARTÍNEZ-NADAL, Petitioner, *v.* EDUARDO J. SALDAÑA, EXECUTIVE SECRETARY, Respondent.

No. 256. Argued April 30, 1928.—Decided June 25, 1928.

*R. Martínez Nadal, Adolfo Dones* and *Armando A. Miranda* for the petitioner. *J. A. López Acosta, Acting Attorney General,* and *R. A. Gómez, Deputy Attorney General,* for the respondent. *José Tous Soto* for the Porto Rican Republican Party, intervenor.

MR. JUSTICE WOLF delivered the opinion of the court.

Rafael Martínez Nadal, in representation of the party legally known as the "Partido Constitucional Histórico," has presented a petition for mandamus which as amended may be said to have a triple aspect, although of course the petition itself prays for certain records to be made. In the first place, accepting the law as it stands, the said party claims the polling at the last election of more than 20 per cent of the votes cast in San Juan and hence according to section 36 of the Election Law the right for said district to nominate by a duly constituted convention, which actually met. The second aspect is to obtain a change of name. The third and

most important is that section 36 of the Election Law be declared unconstitutional, in effect because in prescribing that a party to obtain a right to nominate by convention must have obtained 20 per cent of the total vote cast in the last election, the Legislature has exceeded the limit of reasonable regulation of the electoral franchise.

For the general purposes of this opinion it will be added that in the last election 253,520 votes were cast, of which 132,755 were for the Unionist party, 30,286 for the Republican party, 56,103 for the Socialist party and 34,576 for the Constitucional Histórico party, the one interested in this petition. There were other scattering votes.

We shall dispose of the less important aspects first. Section 36 of the Election Law, as amended July 30, 1923, provides:

"Any political party which shall have cast more than twenty (20) per cent of the total vote of the Island for Commissioner to Washington at the last general election shall be entitled to nominate candidates by duly called conventions . . ."

The mere reading of this convinces us that the intention of the Legislature was to make the 20 per cent provision apply to the total vote of a party in the Island and not to the total vote in special districts. The Legislature was attempting to define what should constitute a political party.

With respect to the name. In 1924 the former Republican party split up into two factions. One of them retained the machinery of the party and continued to be known as Republican Party. The other had a separate convention and became known as the "Partido Constitucional Histórico" and is the real petitioner in this case. The party desires to change its name to become "Partido Republicano Puro." The respondent as Executive Secretary of Porto Rico and also the intervenor, the Republican Party of Porto Rico, set up that the said Republican Party is still using the name and emblem of the party. The petitioner contends that the Republican Party has agreed upon a fusion with the Unionist

Party and that therefore the said Republican Party has lost its personality. The latter, however, contends and shows that this fusion will not take legal effect until the actual day of the election. Section 42 of the Election Law, as amended May 7, 1927, provides:

"No political party shall adopt as a name or emblem a name or emblem which has been previously used or adopted by another political party, either in whole or in part, if such other party still claims and uses such name and emblem. . ."

We are convinced that the Legislature has a right to prohibit the use of a name in whole or in part used by another party and that this prohibition will extend to a name that the other party still proposes to use in the coming election. It makes no difference that at the moment of the election or subsequently thereto the other party proposes to fuse itself with still a third party under a different name. The so-called Republican Party until the election has an independent legal existence.

Incidentally we may say this also settles the right of the legally recognized party known as the Republican Party to intervene in this proceeding as was permitted by this court. Perhaps the intervenor in its brief discussed other matters, but the overlapping we hold to be harmless, especially as the petitioner had no objection to the intervenor as *amicus curiae*. No rights other than those concerning the party named were affected by the intervention.

The petitioner also claimed that the candidate of his party for resident commissioner obtained over 90,000 votes in the last election. This number of votes resulted because the party of the petitioner and the Socialist Party joined their forces and had the same candidate. Perhaps if the words of the Election Law were taken literally such a construction would follow, but necessarily the intention of the Legislature was different.

Before discussing the real constitutional question before us it will be well briefly to trace some of the history of the

political parties in the United States. It would appear that up to about 1832 political conventions as they were subsequently used for nominations and platforms were unknown. Along about that year and thereafter conventions gradually came into use, but there was no such thing as an official ballot. This state of affairs with few exceptions continued for over 60 years. A picture from Wisconsin will show the condition generally prevailing in the United States. "There were great varieties of ballots—no particular color or quality of paper required, they might be written or printed or partly written and partly printed, stickers might be used and there was practically no restriction upon the freedom of action of the individual elector in respect to the casting of his ballot." *State ex rel. Barber* v. *Circuit Court,* 178 Wis. 468, 473. Straight tickets made by the party organizations were frequently used. Toward the end of the century the Australian Ballot was introduced and rapidly became practically universal. It is the system in force in Porto Rico. For an election the Legislature provides for an official ballot which shall be secret and also provides all the machinery therefor. The official ballot, the political parties or persons who shall have the right to be represented thereon and when are the principal objects of the present constitutional inquiry.

More or less contemporaneously with the Australian Ballot the Primary or preferential system of party elections was introduced into the United States. This provided for a selection of certain candidates at an election which took place several months before the general election. To a certain extent this primary election was a substitute for a political convention and was so considered. Theoretically at this preliminary primary election only the adherents of a particular party appeared. The nominal object of this primary election was so far as possible to take the nomination of party candidates out of the hands of the political bosses and put it directly in the hands of the people. It may be said that a primary election was generally designed for the

more important parties, the organizations which had polled a sizable percentage of the total vote of the state in the previous general elections. To the parties which had not polled such a sizable vote the right to meet in convention was very frequently preserved, provided also such a party had obtained a certain smaller percentage of the total vote. The right to obtain a place on the official ballot by petition for still smaller parties, under certain conditions, was also most generally preserved. So also was in general a column included on the ballot for voting independently of any party affiliation. In one State, Minnesota, where primaries were established, the right to nominate by convention was abolished, but under very liberal provisions for the right to go on the official ballot by petition. There may have been other states that also suppressed conventions. The point to be noticed is that the right to meet in convention was carefully preserved until or unless an adequate system of primary elections was introduced into the States. In Porto Rico the primary election system has never been adopted.

Cases, therefore, which refer to the conditions under which a legislature made the right to a primary election depend should be examined with caution. The right to obtain a place on the official ballot may or may not be the result of the primary election. There may be independent ways of going on the official ballot. Some of the laws of the legislatures refer to the right to have a primary election. Others again, a little differently, make the right to go on the official ballot depend upon the result of the primary election itself to which the party had already a right.

When in the books percentages so high as 30 per cent are mentioned, these refer to calculations based on the party strength. At the primary election to secure a right to go on the official ballot the party must in some states obtain a definite percentage, not of the total vote but of the total vote cast for that particular party, say for governor, at the previous election. In other states the primary election must

express a real choice of a considerable number of the party. The percentage so selected legally in these cases bears no relation whatever to the total vote cast in the state, but is solely a test of the party strength. The writer in 1924, along with an opinion, issued an alternative writ of mandamus concerning the constitutionality of a different section of the Election Law. *Martínez Nadal* v. *Saldaña,* 33 P.R.R. 687. He said, page 696:

"A primary law in itself is no guide at all. It is not the election law. The great drift of authority is that in order to prevent fraud and to produce the party's strength the Legislature may require that ten, twenty or thirty per cent of the voters of a party appear on the primary election day. One of the reasons for the high number is to be certain that the candidates are a true expression of the party and that the primary selection is not the partial result brought about by the voters of an opposite party. There is an able discussion in *Ledgerwood* v. *Pitts,* 125 S. W. 1036 . . . It cannot be pointed out too strongly that to require a certain percentage of a previously organized party to be present at the polls is never anything more than an expression of party strength and therefore always a possibility. The party leaders with these percentages of their whole members, in cases of emergency, can find the persons to go to the polls."

Various attacks were made on the Australian Ballot and on the Primary Law, but after a while each method or system was almost universally accepted and about 1910 the jurisprudence became static. A good deal of the history and jurisprudence may be found in *State ex rel. McGrael* v. *Phelps,* 144 Wis. 1, 35 L.R.A. (N. S.) 353, which may be said to have become the leading case and will be mentioned several other times in the course of this opinion.

We come then to the essential question, namely, whether to entitle a party to nominate by convention the requirement by the Legislature of 20 per cent of the total vote cast for resident commissioner in the last election is constitutional.

The supreme governing power may regulate or arrange elections as it pleases. Until some constitution or statute

confers it, there is no natural right to vote. It is then a mere privilege. The legislature of any state, subject perhaps to the United States Constitution, may do practically as it pleases. Where a constitution is framed giving the right to an electoral franchise the right of the Legislature is distinctly limited by the constitution. *Minor* v. *Happersett,* 21 Wall. 162; *Gougar* v. *Timberlake,* 148 Ind. 41, 62 A.S.R. 49, 37 L.R.A. 648, 46 N. E. 339; *State ex rel. McGrael* v. *Phelps, supra;* *State ex rel. Barber* v. *Circuit Court,* 178 Wis. 468, and cases; *People ex rel. Hotchkiss* v. *Smith,* 206 N. Y. 231, 242; *State* v. *Superior Court for King County,* 60 Wash. 370, 111 Pac. 233, 140 A.S.R. 925; *Attorney General* v. *Common Council,* 78 Mich. 545, 18 A.S.R. 458, and note; *Katz* v. *Fitzgerald,* 93 Pac. 112; *State ex rel. Plimmer* v. *Poston,* 58 Ohio, 620, 51 N. E. 150, 42 L.R.A. 238, with special reference to dissenting opinion; *Independence Party Nomination,* 57 Atl. 344; *State ex rel. Binner* v. *Buer,* 174 Wis. 120; 20 C. J. 104 *et seq.,* pars. 90, 91 and 92; 9 R.C.L. 982 *et seq.,* notes 10 and 11; 9 R.C.L. 1046 *et seq.,* pars. 63 and 64.

The books are full of cases which have supported the right of the legislature to regulate the Australian Ballot, the Primary System and the percentage of voters in one or the other to afford the right of either to the primary or to the official ballot itself. It is implicit in all these opinions, and frequently more or less directly expressed, that whether the legislature has or has not exceeded the reasonable regulation of elections is a judicial question. *State ex rel. McGrael* v. *Phelps, supra,* and others. Long ago Mr. Chief Justice Shaw as the organ of the court in *Capen* v. *Foster,* 12 Pick. 485, 23 S. D. 632, said that the legislature might regulate within constitutional limits, but such a construction would not warrant the exercise of legislative power, as, under the pretense and color of regulating, should subvert or injuriously restrain the right itself. Expressions are frequently found that while the legislature might regulate it may not seriously impede or

hinder the electoral franchise. Once established, said the courts, the right to vote is as sacred as any other right.

On May 14, 1928, the Supreme Court of the United States said that the Organic Act for the Philippine Islands had a relation to their governmental affairs not unlike that borne by a state constitution to a state. *Springer et al.* v. *Governor of the Philippine Islands.* The Organic Act of Porto Rico has established the electoral franchise for Porto Rico. Sections 26, 27, 28, 29, 35 and 36. The sections are copied in full in *Martinez Nadal* v. *Saldaña,* 33 P.R.R. 690. Reading them over there can be no doubt that qualified voters in Porto Rico have the right to the electoral franchise. Under section 35 the Legislature may under certain limits increase the qualifications, but it may not take away or seriously impede or hinder the electoral franchise once definitely bestowed.

Section 36 of the Election Law, as amended, provides:

"Any political party which shall have cast more than twenty (20) per cent of the total vote of the Island for Commissioner to Washington at the last general election, shall be entitled to nominate candidates by duly called conventions. . . ."

A congruous provision is found in amended section 14, as follows:

"By 'principal parties' are meant the two political parties whose candidates for Commissioner to the United States received the highest and next to the highest number of votes cast for candidates for that office at the preceding election; by 'majority party' is meant the political party whose candidate for Commissioner to the United States received the highest number of votes cast for a candidate for that office at the preceding election; by 'organized party' is meant a political party whose candidate for Commissioner to the United States received twenty per cent or more of the total vote cast for all candidates for that office at the preceding election; and any political party which has acquired the standing of 'principal party,' 'majority party,' or 'organized party' shall be considered and treated as such until a candidate of such party for Commissioner to the United States fails at a subsequent election to receive the number of votes necessary to confer such standing on such party under the rules hereinbefore stated in this Section."

We think these sections and especially section 36 will necessarily impede the right of voters in Porto Rico. In *State ex rel. McGrael* v. *Phelps, supra,* Mr. Justice Marshall perhaps at times speaking for himself showed that there was a neutral zone wherein it was dangerous for the legislature to step. From the reception the case has received it may be considered that the opinion is accepted law. The court held that within that neutral zone the court should follow the legislature, as the Wisconsin court by a majority vote in that case did. Two of the seven judges dissented. The facts over which Judge Marshall evidently vacillated were these. The laws of 1909 provided that if the aggregate of votes at a primary election for all candidates ''for nomination for any one office voted for on any party ballot'' shall be ''20 per cent or more'' of the number ''cast for nominees of such party for governor at the last general election'' the one receiving the most votes shall have his name ''placed on the official ballot at the following election'' as such party's candidate for such office, etc. The difference between the judges was whether the 20 per cent requirement of the previous party vote, even at a primary election, was not excessive. Experience has shown that, while voters will go to a general election in sufficient number, it is hard to make them go to a primary. Should a party be forever subject to rallying its members, especially at moments of no great concern or when the nomination of a particular person was a foregone conclusion? Questions of this kind have been in the minds of various judges.

To get an idea of what this requirement would amount to, let us reproduce some figures for Porto Rico. If the Wisconsin law had prevailed here, the Unionist party, casting 132,755 votes at the last election, would have had to produce 26,551 at the primaries, or a little over 10 per cent of the total vote cast of 253,520. The Socialist party would have to produce about 4 per cent of the total vote and the Republican and the petitioners each less than 3 per cent. The Wisconsin

law and other states having high percentages at the primaries would be distinctly favorable to minority parties if the measure is taken from the total vote cast in the state. If its relation to such total vote be considered, the primary system is harder on the greater parties than on the small ones, but the majority party should always be able to rally its strength and has a stimulus for doing so.

In the Wisconsin case Judge Marshall shows that similar provisions have been sustained and cited cases where a certain percentage of the total vote had been required at the primaries to go on the official ballot. He mentioned three cases as apparently requiring 10 per cent. Two of them we have examined and they only required 3 per cent. The third was the Minnesota case of *State ex rel. Fitz* v. *Jensen*, 86 Minn. 19, 89 N. W. 1126. Ten per cent was required there. conventions were abolished but very liberal provisions were made for the right to go on the official ballot by parties. In the Minnesota case the court said that some of the judges thought that the percentage was high, but evidently the court decided that the fixing of this percentage was not without the legislative privilege. *Schafer* v. *Whipple*, 55 Pac. (Col.) 180, was one case that we have found which shows that the state required as much as 10 per cent for a party to nominate by convention and a similar law was shown to have been passed in Louisiana. *Labauve* v. *Michel*, 121 La. 374, 46 So. 430. In the Colorado case a smaller percentage of the electorate may obtain representation in the official ballot by petition. No constitutional question of the right to fix 10 per cent was raised. We have not stopped to examine the conditions in Louisiana, but it was only an attempt to regulate the primary and not the official ballot.

It is of course physically impossible within the time at our disposal to review all the statutory law applicable in any particular jurisdiction, to say nothing of the jurisprudence covering so general a matter. Suffice it to say that our reading convinces us that when a limitation is put on the

right to meet in convention or even use the primary, the percentage rarely exceeds 5 per cent of the total vote, and is generally as low as 1, 2 or 3 per cent. It may be said that a 10 per cent requirement was the limit of the neutral zone to which Judge Marshall referred and that the legislature generally kept the percentage much below and within strictly reasonable limits.

The Acting Attorney General has cited several cases that are covered by the foregoing reasoning. There is, however, one case that is absolutely different and has no application. The State of Washington provided that to go on the official ballot a candidate must have obtained 40 per cent of certain votes actually cast at the primary, but if this 40 per cent were not obtained a choice should be made in any other way. With respect to this case, therefore, the 40 per cent is a mere number and has no relation except to the results of the primary election itself. Moreover, in the State of Washington by the same Act the right to nominate by convention is distinctly preserved for parties who cast less than 10 per cent of the total vote in the last election, in accordance with the existing law. Parties over 10 per cent evidently had a right to have recourse to the primary.

Various ideas have been uttered to explain the exclusions to which the legislatures have resorted. One is that unless a lower limit were fixed any small group might attempt to arrogate to itself the right to be a party just as, so in numerous cases the courts have said, the three tailors of Tooley street styled themselves "The People of England." When, however, a party can obtain five or ten per cent of the total vote of a state it necessarily is not an inconsiderable expression of public opinion. Another idea, of course, is to prevent the overcrowding of the official ballot, but where a constitution gives a right to vote a considerable body of voters should not be excluded on such a ground. The better opinion has placed the limit considerably lower. Wisconsin reduced the 20 per cent of the party vote to 10 per cent and yet on a

test case two other judges dissented from such a limit. _State ex rel. Bentley_ v. _Hall_, 178 Wis. 172. By some sort of local condition the Democratic party failed to turn out in sufficient numbers at a primary election. The court, however, sustained the right of the Legislature to put a reasonable lower limit, citing and approving _State ex rel. McGrael_ v. _Phelps, supra_. The Legislature probably heeded the court in the _McGrael Case_ and placed a lower limit.

Once the right to vote is definitely established, the right of voters to form themselves into nuclei of public opinion is just as sacred as the right to vote. _People_ v. _Election Commissioners_, 221 Ill. 9, 97 N. E. 323, 5 A. & E. Ann. Cas. 562; _State ex rel. Adair_ v. _Drexel_, 105 N. W. 174.

_Johnson_ v. _Grand Forks County_, 113 N. W. (North Dakota) 1071, was a case where, among other things, the court declared that it was incompetent for the legislature to prescribe qualifications of voters or candidates in addition to those fixed in the Constitution, which is far from being the case before us. The court quoted from _Britton_ v. _Board of Commissioners_, 129 Cal. 337, 61 Pac. 1115, 51 L.R.A. 115. That is a case wherein the court declared unconstitutional in California an act which fixed a 3 per cent lower limit, it may be said, because of local constitutional provisions. Although the flux on the main point has been in another direction, the opinion of Mr. Justice Henshaw is nevertheless frequently cited. He said: "Active political parties, parties in opposition to the dominant political party, are, as has been said, essential to the very existence of our government. The right of any party of men holding common political beliefs, or governmental principles, to advocate their views through party organization, can not be denied . . . The law which will destroy such party organization or permit it fraudulently to pass into the hands of its enemies can not be upheld. The procedure of political parties may be regulated, and the wisdom of the Legislature may well be exercised in devising methods to check political corruption and fraud, but the

Legislature itself under the guise of regulation can not be permitted to throw open the doors to these very abuses." Then the North Dakota court quoted from Mr. Wigmore in his work on the Australian Ballot as follows: "But it is to be remembered that in this country a candidacy may be hopeless as regards the election of the nominee, and yet important and highly desirable as a means of exhibiting the strength of a section of electors or of a particular movement, and, of course, compelling the attention of the leading parties, and the modification of their platforms and legislative policies."

The Legislature may regulate but may not transcend the realm of reasonable regulation. Courts, with some reluctance we should say, have bowed their heads, where the Legislature as a definition of a political party, for the purpose of a primary election have placed a lower limit of 10 per cent cast in the last election. Generally other liberal ways were provided for getting party representation in the official ballot. The legislature, however, has no right to prevent parties from expressing themselves through party conventions, unless the party does not form a recognized sizable portion of the community. Under the experience in the United States it may be said that a party that had polled more than 10 per cent of the total vote in the last election was clearly too large a party to be so excluded. The attempted exclusion necessarily prevents large numbers of qualified voters from giving voice to their choice of candidates in the normal way. We say normal way because in Porto Rico the convention has been and is the only recognized way of party expression. No case can be found where the definition of a party for any purpose has been made to exceed 10 per cent.

It is no answer to argue as did the intervenor that a minority party has a redress by petition, and that the petitioners showed in the last campaign that they could obtain 10 per cent by petition. The method by petition should ordinarily be for a new party, for a dwindling one, or for one that fell below a recognized reasonable standard. In Germany

recently thirty parties went to the polls. Even if there are three or four important parties any of them may readily have less than a following of 20 per cent. Party expression should be free unless it is a case of *de minimis,* as shows the reference to the three tailors of Tooley Street. The petition is difficult for greater numbers, is subject to challenge and subjects smaller sizable parties to serious handicaps.

Necessarily the suggestion that there is now on the official ballot an independent column is no answer. From time immemorial the advantages of a straight or party ticket are too obvious for comment.

There was also the suggestion that the Legislature in Porto Rico wanted to preserve the large-party system. The legislature has no such function in a republic. The voters must be free to combine and to change their allegiance as they choose. Today it may be that certain large groups are desirable. Tomorrow it may be quite otherwise.

Perhaps if the law for inclusion by petition had been more liberal something might be said in favor of nominations by petition. The Legislature has not seen fit to modify section 37 requiring 10 per cent of the total vote even by petition, although it seems to be considered high and a judge of this court in 1924 expressed his opinion that it was unconstitutional.

Some argument has been made or might be made that the provision in regard to 20 per cent has been on our statute books since 1906. It was never challenged simply perhaps because there was no occasion therefor, although perhaps it might have been challenged under section 29 of the Foraker Act. Be that as it may, the present Organic Act was adopted in 1917 and is the constitution for Porto Rico, no matter what were the previous enactments of the Legislature.

To resume. The right to vote is guaranteed by the Organic Act. There are no primaries in Porto Rico. The primary was a substitute for the convention. The convention remains in Porto Rico the normal way for parties to

nominate their candidates. Any serious interference with the right to meet in convention is hence an interference with the right of the qualified electors to express themselves.

Therefore, we feel bound to hold that the 20 per cent requirement of section 36 is unreasonable and void. What the effect would be of declaring this section unconstitutional need not be specifically determined for all cases. We simply hold that the party represented by the petitioner and which polled more than 10 per cent of the total vote in the last election has a right to nominate by convention.

The executive secretary spoke about a discretion. Of course the secretary would not only have a discretion but a duty to refuse any request of petitioner if he does not represent a party with a right to speak by convention. If, as we hold, section 36 is unconstitutional, the duty of record is clear. That mandamus lies to compel the executive secretary is apparent from the mandamus law and from the numerous decisions, some of which we cited for other purposes in this opinion.

Something was said in the pleadings, briefs or at the hearing that no demand had been made on the executive secretary for a general record of the "Partido Constitucional Histórico." If, however, as we hold, the said party has a right to meet in convention and nominate, the secretary was under a duty to record the nominations for San Juan. On a fresh petition he would be obliged for the Island. Notice enough he has had from the amended petition. In a matter of this sort, where the executive secretary under the advice of Attorney General is defending the validity of section 36, no particular demand is necessary. In this regard see also *Martínez Nadal* v. *Saldaña*, 33 P.R.R. 687.

Hence, as section 36 of the Election Law is unconstitutional, it follows that the "Partido Constitucional Histórico" has a right to record its candidates for the district of San Juan elected in convention, and consequently the peremptory writ of mandamus should be issued.